## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| BILFINGER INC. | § | |
| | § | |
| | § | |
| | § | CIVIL ACTION NO. 1:24-cv-00362-JB-M |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| INFAB, LLC, | § | |
| | § | |
| AND | § | |
| | § | |
| XCEL NDT LLC | § | |
| | § | |
| Defendants. | § | |

---

## FIRST AMENDED COMPLAINT

---

Plaintiff, Bilfinger Inc. ("Bilfinger"), pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure, hereby amends its complaint against defendant, InFab, LLC ("InFab") and adds XCEL NDT LLC ("Xcel") as a defendant. As amended, the complaint reads in its entirety as follows:

### <u>NATURE OF THE ACTION</u>

1.      In this action, Bilfinger seeks to recover the substantial damages that it incurred while working on an expansion project (the "Project") for Evonik Corporation ("Evonik") at Evonik's existing manufacturing facility in Theodore, Alabama (the "Site"). The Project will bolster Evonik's animal-nutrition business by producing a product used in livestock farming to feed animals in a healthy, efficient, and sustainable manner while also reducing the site's carbon footprint. To that end, Evonik contracted with Bilfinger to fabricate and erect piping and install

process equipment for the Project. In turn, Bilfinger subcontracted with InFab to fabricate the Project's carbon-steel and stainless-steel piping in InFab's shop in South Carolina and deliver that pipe to the Project site. InFab retained Xcel to, among other things, conduct non-destructive evaluations ("NDE") of InFab's welds at its fabrication shop, interpret test results, and determine if InFab's welds met the required standards and code requirements.

2.      Unfortunately, while fabricating that pipe in its shop, InFab created serious production, quality, and documentation problems that caused InFab to materially breach its subcontract and warranties. What is more, Xcel examined InFab's welds at its fabrication shop but failed to correctly determine if InFab's welds were of the required quality to be classified as "accepted" and made other errors that caused InFab's welds to be incorrectly classified as meeting the required standards.  These pipes with the incorrectly accepted welds were subsequently shipped to the Project where the defective welds were eventually discovered.  Xcel's incorrect classification of these welds as acceptable prevented InFab from repairing its defective welds in its shop and instead required InFab to repair them onsite in the field thereby creating more problems, delays, disruptions, and corresponding costs. In many instances, InFab had to repair those problems in the field and retest and report on the repaired welds and pipe. InFab's repair work and corresponding testing and documenting of that repair work delayed and disrupted Bilfinger's efforts to install InFab's pipe and caused Bilfinger to incur significant additional costs to keep the Project on track.  InFab admitted creating those problems, blamed its inspector, Xcel, for causing some of them, and worked to correct those problems for more than four months. But when Bilfinger first requested reimbursement from InFab for the substantial costs Bilfinger had incurred solely because of InFab's problems, in accordance with the provisions of the contract between Bilfinger and InFab, InFab abruptly abandoned Bilfinger and the Project.

3.      InFab's problems and abrupt abandonment required Bilfinger to perform InFab's work along with its own work and forced Bilfinger to perform a second scope of work with resources and staffing intended for Bilfinger's own scope of work.

4.      As of mid-October 2024, Bilfinger continues to perform InFab's work and expects to do so for at least another four weeks.

5.      To date, Bilfinger has spent more than $10 million to identify, rework, and retest InFab's defective welds in the field/on-site, an amount that would have been significantly less if the welds could have been repaired in InFab's fabrication shop, because of Xcel's inadequate inspections/evaluations, incorrect determinations and other errors and to correct and supplement InFab's and Xcel's records and reports. Bilfinger has also incurred additional costs because InFab's problems and Xcel's errors, omissions, and misrepresentations required Bilfinger to install piping inefficiently and delayed Bilfinger's work and the overall Project.

## THE PARTIES

6.      Bilfinger is incorporated in Delaware with its principal place of business located at 1450 Lake Robbins Drive, Suite 600, The Woodlands, Texas 77380.

7.      InFab is a South Carolina LLC incorporated in South Carolina with its principal place of business located at 10 Falcon Crest Drive, Greenville, South Carolina 29607. On information and belief, Kevin Bean is the sole member of InFab and is a citizen of South Carolina.

8.      Xcel is an Oklahoma LLC incorporated in Oklahoma with its principal place of business located at 1141 36th Avenue, NW, Suite 200, Norman, Oklahoma, 73072. On information and belief, Xcel Holdco, LLC is the sole member of Xcel. Xcel Holdco is a Delaware limited liability company with its principal place of business located in Norman, Oklahoma.  The sole member of Xcel Holdco is Xcel Topco, LP, a Delaware limited partnership with its partners being Delaware citizens.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(b) as it is between citizens of different States and the amount in controversy exceeds $75,000.

10.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because (a) a substantial part of the events or omissions giving rise to the claims occurred in this District and/or the property that is the subject of the action is situated in this District and (b) the Parties' Agreement requires them to litigate in the Federal Court nearest the place of the Project, which is this Court.

## FACTUAL BACKGROUND

### I.      Bilfinger's Agreement with Evonik.

11.     Bilfinger entered into an Agreement for Services and Goods with Evonik effective as of March 9, 2018 ("Master Services Agreement").

12.     Under the Master Services Agreement, Bilfinger's Scope of Work ("Scope of Work" and/or "Work") included the following: piping, equipment installation, civil structural steel work, and related services at one or more of its sites as further specified in purchase orders that Evonik would issue to Bilfinger from time to time.

### II.     The Evonik Purchase Order for the Project.

13.     Pursuant to the Master Services Agreement, Evonik issued Purchase Order Number 4707722386 (the "Evonik P.O.") to Bilfinger with an official date of February 17, 2023.

14.     The Evonik P.O. required Bilfinger to fabricate and erect piping and install process equipment for the Project.

15.     More specifically, the Evonik P.O. required Bilfinger to provide the following services: project management, supervision, field survey and layout, shop and field labor, materials, fabrication, equipment, safety management, transportation, tools, temporary facilities, consumables, insurances and other goods and services required to fabricate and erect the Project's piping and install its process equipment.

16.     The Evonik P.O. has a Delivery Date of November 8, 2023, with Liquidated Damages commencing on December 8, 2023.  The Delivery Date has subsequently been extended to August 10, 2024 based on changes agreed to between Bilfinger and Evonik.

**III.    The Bilfinger/InFab Agreement.**

17.     On January 27, 2023, InFab submitted Proposal Number 22-BIL236 to provide the Project's shop-fabricated carbon-steel and stainless-steel piping.

18.     On March 3, 2023, Bilfinger issued Purchase Order Number 5800105727 for InFab to provide the Project's shop-fabricated carbon-steel and stainless-steel piping ("the Bilfinger Purchase Order").

19.     The Bilfinger Purchase Order includes Terms and Conditions that the parties negotiated (the Complaint refers to the Bilfinger Purchase Order and the Terms and Conditions collectively as the "Agreement").

20.     The Agreement contains the Parties' entire agreement and does not reference or incorporate InFab's Proposal.[1]

21.     The Agreement states that Alabama Law controls as the Project is located in Alabama.

22.     The Agreement contains a provision entitled "Time is of the Essence" stating, in pertinent part, the following:

> Subject to any limitations set forth in this Purchase Order/Contract, [InFab] shall be liable to [Bilfinger] for loss and damage sustained by [Bilfinger] as a result of [InFab's] delay or failure, with the exception of delays beyond [InFab's] reasonable control.  As a condition precedent to [Bilfinger's] right to exercise its rights as set forth in this provision, [Bilfinger] is required to provide written notice to [InFab] specifying the delay or rejected good or service and provide [InFab] five days' time to cure or commence and diligently proceed with its efforts to cure.

---

[1] The Agreement refers to Bilfinger as Contractor, InFab as Vendor, and Evonik as the Owner. For consistency, the Complaint refers to the Parties as Bilfinger and InFab when citing to the Agreement. Likewise, the Complaint refers to Evonik as the Owner.

23.     The Agreement sets forth InFab's obligations to defend, indemnify and hold

harmless Bilfinger and Evonik as follows:

> Subject to any limitations set forth in this Purchase Order/Contract, [InFab] agrees to defend and indemnify and hold [Bilfinger] and [Evonik] harmless for any costs, damages (including damage to property or the environment) . . . liabilities, claims, settlements, demands, lawsuits, penalties, interest, taxes or liens which [Bilfinger] may incur, be found liable for or are required to pay (collectively called "Claims") to the extent such Claims arise out of [InFab] or [InFab's] subcontractors' furnishing goods or providing services to [InFab] under this Agreement. **THIS PROVISION WILL REQUIRE [INFAB] TO INDEMNIFY AND DEFEND [BILFINGER] AND [EVONIK] FOR CLAIMS TO THE EXTENT CAUSED BY [INFAB] OR [INFAB'S] EMPLOYEES' NEGLIGENCE WHEN SUCH CLAIMS ARISE OUT OF THE JOINT OR CONCURRENT NEGLIGENCE OF (1) INFAB AND BILFINGER'S EMPLOYEES (INCLUDING [INFAB'S] SUBCONTRACTORS AND THEIR EMPLOYEES) AND (2) [BILFINGER] AND [BILFINGER] EMPLOYEES. HOWEVER, INFAB WILL NOT BE REQUIRED TO INDEMNIFY BILFINGER (1) IF THE CLAIM IS THE RESULT OF [BILFINGER] OR [BILFINGER] EMPLOYEES' SOLE NEGLIGENCE, (2) FOR THE PORTION OF ANY CLAIM WHICH IS CAUSED BY A THIRD PARTY OTHER THAN INFAB'S EMPLOYEES OR [INFAB'S] SUBCONTRACTORS OR THEIR EMPLOYEES.** This indemnity is separate from [InFab's] insurance and [InFab] shall be responsible even if [InFab's] insurance carrier denies coverage. (Capital letters and boldface in original).

24.     The Agreement contains a Lien-Waiver provision stating as follows:

> [InFab] shall not file and agrees to waive any right [InFab] may have to file a mechanic's or materialman's lien against [Bilfinger] or any of [Bilfinger] facilities (or [Evonik's] facilities) for any labor or material for which [InFab] received payment for as part of the performance of Vendor's obligations or services under this Agreement. In the event any such lien is filed by [InFab] or one of [InFab's] subcontractors who has furnished labor or material, [InFab] shall at [InFab's] own expense take steps to promptly remove the lien by bond or otherwise. [InFab] further agrees to indemnify and hold [Bilfinger] harmless for any loss or damage [which] [Bilfinger] may suffer or incur as result of [InFab's] failure to comply with this provision.

25.     The Agreement includes a Quality provision stating as follows:

> [InFab] warrants that the goods which [InFab] delivers shall be new and of good and merchantable quality and conform to the description stated in this Agreement; and that such goods will be fit for the intended use which [Bilfinger] has described to [InFab]. [InFab] agrees to promptly repair or replace any defective goods that [Bilfinger] has notified [InFab] in writing about within one (1) year following delivery. Upon notice, if [InFab] fails to promptly repair or replace the defective goods, [InFab] agrees that [Bilfinger] will be entitled to repair or replace them. In such case, [InFab] agrees to reimburse [Bilfinger] for [Bilfinger's] reasonable cost to repair or replace the defective goods. [Bilfinger] will be entitled to inspect all

goods before, upon or within a reasonable time after delivery. No substitution of any goods shall be made without [Bilfinger's] written approval. [Bilfinger] reserves the right to reject goods which have been reworked.

26.    The Agreement also includes a Performance provision stating, in pertinent part, as follows:

[InFab] agrees to (1) perform all services in a good, workmanlike, efficient and safe manner, (2) supply all necessary labor, materials, tools and equipment, (3) conform to all required governmental and accepted industry standards of engineering, construction and safety, (4) comply with [Bilfinger] plant rules and (5) perform the services in accordance with the specifications and drawings which [Bilfinger] has provide[d] to [InFab] or which [InFab] has furnished and [Bilfinger] has approved.

27.    The Agreement's Performance provision also states the following:

[InFab] agrees that it will be fully responsible to Bilfinger for the errors, acts, and omissions of [InFab's] employees or it[s] subcontractors (and their employees) assisting [InFab] in performing the services as if such errors, acts, and omissions were committed by [InFab]. [InFab] agrees that all supervisory and craft personnel shall have the skills, licenses, and training necessary, for performance of the services as required by governmental regulation, industry standards, and [Bilfinger] plant rules.

28.    The Agreement contains a provision entitled Owner Requirements stating, in pertinent part, as follows:

[Evonik] shall have the right to engage an independent auditor to inspect and audit [InFab's] records relating solely to [InFab's] obligations and/or any goods provided, under this Agreement, to evaluate and verify [InFab's] compliance with the terms of this Agreement.

## IV.    InFab's Production, Quality, and Documentation Problems and Xcel's Inadequate Inspections/Evaluations, Incorrect Determinations, Other Errors and Misrepresentations Caused Schedule and Cost Impacts.

29.    Before InFab began working on the Project, it virtually met with Bilfinger, Evonik, and the Project's engineer, Wood Group ("Wood") to ensure that InFab clearly understood the fabrication expectations and requirements such as the code of construction and Evonik's specifications and requirements on the approved line list (documents or a database that piping engineers use to design piping systems).    The Subcontract and follow-on Change Orders

memorialize those expectations.

30.     Once Bilfinger began working on the Project, Bilfinger conducted monitoring on InFab's fabrication efforts at its fabrication shop ("shop") and noted cross contaminations between carbon steel and stainless steel piping that it subsequently documented in Non-Conformance Reports ("NCR") 002, 003, and 009.

31.     InFab mobilized to the site to perform passivation on the stainless steel spools with carbon contamination (a method to prevent corrosion) and address the problems caused by poor material segregation practices in its shop.

32.     Industry standards and the applicable codes require that welds must be tested using a volumetric method of non-destructive testing (NDT) so that defects are detected throughout the full body of a welded joint; the most widely recognized volumetric NDT methods are radiography ("RT") and ultrasonic testing ("UT").

33.     Initially, the testing showed an InFab weld rejection-rate of >10%, which is high for shop fabrication.

34.     Bilfinger worked with InFab to reduce that rejection rate.

35.     As a result, InFab's weld rejection-rate declined and normalized at approximately 4% as supported by visual inspections and RT inspections conducted by InFab and  Xcel.

36.     Further, periodic monitoring based on the RT performed by Xcel showed no signs of significant concern.

37.     Xcel examined InFab's welds at its fabrication shop,

38.     InFab reported this approximate 4% weld rejection-rate many times at the weekly construction meetings with Bilfinger, Evonik, and Wood.

39.     In early December 2023, Evonik selected a random group of pipe spools for inspection, and the subsequent inspections revealed that Xcel had made a substantial number of incorrect determinations regarding the RT test results (accepting or rejecting welds).  Bilfinger

8

documented that problem in NCR-004.

40.    Later, Bilfinger issued NCR-005 after testing results showed a 56% rejection of welds that Xcel had previously evaluated as deemed to be acceptable.

41.    As a result, Bilfinger accompanied Xcel on a full-scale audit of 4,500 welds that InFab had performed in its shop. Tier 1 Integrity, LLC ("Tier 1"), a third-party NDE provider, was retained by InFab to conduct that audit. The audit results showed that Xcel had either evaluated more than 1,600 welds incorrectly (determined them to be acceptable when they were not acceptable) or the radiographs of the welds taken by Xcel had non-compliant image quality that Tier 1 could not properly evaluate.

42.    Similarly, Bilfinger observed 700 welds with "film side" markers or "F" letters, as required by the American Society of Mechanical Engineers ("ASME") Boiler and Pressure Vessel Code Section V, Article 2 Radiographic Examination Section T-277 (b) (the applicable industry code with regard to radiographic examination of piping under pressure) that Xcel either did not use or were placed incorrectly by Xcel.

43.    InFab mobilized Supervisor Eddie Gasbarri (now Plant Manager) and Quality Representative Trent Culp to the Project site to start addressing contamination, welding and NDE rework.

44.    InFab also mobilized a welding crew of InFab employees to the Site to facilitate weld repairs, along with crews from Xcel and Tier 1 to perform NDE activities including additional RTs.

45.    InFab's poor recordkeeping and execution made the rework efforts extremely difficult and time consuming.

46.    During this time, Bilfinger requested numerous times that InFab provide its Normal Fluid Service (NFS) welder-lot tracking system. The NFS welder-lot tracking system is a requirement of ASME B31.3 Process Piping (the industry code required under both the Evonik

P.O. and the Agreement) and is a system by which the welder(s) that worked on a particular weld can be identified.

47.    InFab notified Bilfinger that it would provide its welder-lot tracking-system expeditiously but never provided it.

48.    Eventually, Bilfinger learned that InFab had never even categorized the NFS welds in any type of lot-system and did not provide any compliant data on the required progressive sampling. A similar lack of InFab reporting also carried over to the Category "M" welds (welds that require 100% volumetric inspection) and InFab again did not provide any compliant data.

49.    Consequently, Bilfinger had to bring on additional quality staff to re-create the entire 20,000+ fabrication lot system and manage InFab's fabrication to ensure that the InFab welds complied with all applicable requirements.

50.    On December 22, 2023, Bilfinger formally notified InFab in writing of several quality-related problems resulting from the pipe that InFab had fabricated and delivered to the Project (the "December 2023 Notice").

51.    In the December 2023 Notice, Bilfinger reminded InFab that it had previously issued NCR-002, NCR-003, and NCR-004 because of InFab's piping-quality problems.

52.    The December 2023 Notice informed InFab that Bilfinger anticipated that InFab's piping-quality problems would substantially lengthen its schedule and increase its completion costs for the Project and as such Bilfinger would, in accordance with the Agreement, back-charge InFab for the costs that it incurred as permitted by the Agreement.

53.    More specifically, the December 2023 Notice informed InFab that as of December 22, 2023, Bilfinger's schedule and cost impacts at issue in NCR-002, NCR-003, and NCR-004 resulted from InFab's shop practices, contamination of stainless steel and discrepancies with RT results and documentation.

54.    Significantly, the December 2023 Notice acknowledged that while InFab was

working to correct its nonconformances in NCR-002, NCR-003, and NCR-004, those nonconformances had limited, disrupted, and (in some cases) required Bilfinger to stop installing piping spools thus significantly delaying Bilfinger's schedule and potentially delaying Project completion, which would in turn expose Bilfinger to significant liquidated damages from Evonik for failing to complete the Project on time.

55.     The December 2023 Notice also summarized NCR-002, NCR-003, and NCR-004 as follows:

> NCR-002: InFab's shop practices led to contaminated stainless steel. Bilfinger notified InFab that it needed to address the contaminated areas set forth in the NCR and detailed in the Wood Group's [Project's engineer of record] audit. NCR-003 detailed the consequences resulting from [InFab's] shop practices after InFab delivered the contaminated piping to the Project.
>
> NCR-003: InFab delivered to the Project site pipe spools with shop welds exhibiting obvious contamination and rust.  Further, pipe spools had rust marks on the pipe from jack-stand marks or using rollers without placing a barrier between contaminated rollers and the stainless-steel pipe material.  Bilfinger must now visually inspect the stainless-steel spools for contamination; quarantine spools requiring passivation that prevents Bilfinger from installing contaminated spools. Further, when the contaminated spools must be passivated [altering a surface layer or coating with a thin inert layer to make it unreactive], Bilfinger must continue surveilling the spool to ensure that it does not get contaminated again for five days after each passivation procedure until a copper-sulfate test visually confirms that the spool has no rust.
>
> NCR-004: Bilfinger has noted discrepancies in the RT film and reporting from InFab's shop.  As a result, Bilfinger must audit all Category M welds and percentage-based inspection of welder lots for Normal-Fluid-Service [NFS] welds.  Bilfinger will not know the magnitude of the problems in this NCR, potential cutouts, rework, and NDE [non-destructive engineering] until it finishes auditing the RT film.

56.     The December 2023 Notice concluded by requesting that InFab acknowledge NCR-002, NCR-003, and NCR-004 and confirm that InFab would remediate all the nonconformances and pay all Bilfinger's resulting costs as required by the Agreement.

57.     In a letter dated January 3, 2024, Bilfinger acknowledged receiving InFab's December 24, 2023 email committing to (a) work diligently to achieve contractual delivery dates and (b) resolve InFab's production issues to avoid any schedule impact.

58.     In that letter, Bilfinger noted that it had to address several items from InFab's email including: (1) contamination, (2) Evonik's borescope inspection and subsequent RT Review, and (3) the schedule to resolve the InFab issues (the "Resolution Timeframe").

59.     As to contamination, in pertinent part, Bilfinger stated that NCR-002 and NCR-003 related only to spools that InFab had delivered to the Project site. Bilfinger further stated that InFab clearly had problems fabricating spools in its shop because photographs from Wood's recent audit showed "cross contamination of handling equipment, tool segregation and work practices." Bilfinger also rejected InFab's contention that the spools had been contaminated on site.

60.     As to Evonik's borescope inspection and subsequent RT Review, in pertinent part, Bilfinger noted that Evonik had reserved the right to inspect the pipe and randomly performed a borescope inspection of selected welds after which it asked to review the RTs inspected by the borescope. That evaluation showed that approximately 56% of the accepted RTs viewed were rejectable under two different criteria, thus bringing all RTs into question. Bilfinger identified the criteria that InFab had to meet to bring welders on site to repair welds in the field.

61.     Concerning the Resolution Timeframe, in pertinent part, Bilfinger rejected InFab's contention that its problems had not impacted the schedule. Bilfinger noted that delays to the Project had started when Bilfinger had first identified non-compliant InFab welds that InFab would need to repair in the field and, as such, InFab would need to quickly make the necessary repairs to minimize the delays and impacts to the Project's schedule. Bilfinger also requested that InFab provide its (a) weld tracker and (b) NFS welder lots in each stage. Bilfinger noted that InFab had not provided either one, as required by the Agreement, and thus would delay the closing of the audit and NCR-004.

62.     On January 18, 2024, Bilfinger issued a revised NCR-005 (NCR-005R1) detailing discrepancies in RT film and reporting from InFab's fabrication shop. More specifically, Bilfinger

issued NCR-005R1 because of (a) discrepancies with InFab's records, (b) InFab's lack of weld traceability, (c) InFab's failure to produce NFS lot info, and (d) a 40% reject rate based on ASME B31.3 with RTs taken to resolve the prior image-quality issues.

63.     NCR-005R1 additionally noted that InFab's remediation efforts were ongoing and subject to being cleared via NDE by Bilfinger's quality personnel so that Bilfinger could test, restore, and commission the affected systems.

64.     In a letter dated January 23, 2024, Bilfinger (a) notified InFab that it had to immediately correct its continuing defective/unacceptable work, (b) directed InFab to perform certain work and provide certain information at its own cost by certain dates/times; and (c) reiterated that InFab had not adequately documented its work thereby requiring Bilfinger to incur the costs of doing so.

65.     Bilfinger concluded that letter by again notifying InFab that it had failed to timely complete its work in accordance with the required quality standards and that InFab's failures had substantially delayed Bilfinger in completing its work.  Bilfinger warned that if InFab failed to timely comply with the letter's requirements that Bilfinger reserved the right to terminate it for cause (fully or partially), take over InFab's work (all or part) and charge completion costs to InFab resulting from InFab's continuing delays and production failures.  Bilfinger requested that InFab confirm in writing that it would timely and fully comply with the letter's requirements by 5pm CST on January 24, 2024.

66.     In a January 24, 2024 letter, InFab acknowledged receiving Bilfinger's January 23rd letter and then stated the following:

> InFab's NDE contractor [Xcel] has created an extraordinary situation that InFab has and continues to make every effort possible to remedy in a timely manner. InFab stands by our right to cure, and it is our intent to fully comply with the specifications for the project.

67.     In that letter, InFab also admitted the following: (a) InFab agreed that Bilfinger would require its own Level III [inspector] to be on site to review the RT inspection process; (b)

Bilfinger had a Level II [inspector] from Tier 1, one of InFab's NDE subcontractors, reviewing and clearing film; (c) InFab had already proactively enlisted the services of contractors Team Industrial Services, Inc. and Mistras Group to supplement Xcel's NDE effort with three crews; (d) InFab was also bringing in Tier 1 for additional NDE crews; (e) InFab was already paying for additional NDE services; (f) InFab would commit to reimbursing Bilfinger's Level III as required in NCR-005 with proper backup invoices; (g) InFab had reached out to three staffing firms to augment its site workforce to accelerate the repair; and (h) InFab was committed to getting the necessary welders on site to meet the daily repair needs of "cleared for repair welds" as identified by NDE crews and Bilfinger's Level III.

68.    InFab closed that letter by promising Bilfinger that it would perform the necessary repairs and finish its work on the Project:

> In closing, InFab is confident in our ability to provide the necessary repairs in strict conformity with the project specifications. We value our partnership with Bilfinger and are dedicated towards completing this project while ensuring only the highest quality standards are met. The skill and integrity of our resources play a vital role in this project and we look forward to completion of our scope in a timely manner.

69.    Despite InFab's promises, as of late January 2024, InFab's ongoing quality problems, production delays, documentation problems, and corresponding schedule and cost impacts left Bilfinger with no confidence that InFab or Xcel could timely and/or properly perform their work. In fact, Bilfinger began to question if InFab's documentation was correct without Bilfinger having to reconcile each item given (a) there were over 1,600 improper NDE RT tests; (b) InFab's rejection rates were determined to actually be between 20-50% despite the fact that InFab was reporting less than 4% in their weekly reports; and (c) InFab's lack of candor on the NFS lot tracking.

## V.    InFab Abandoned Bilfinger and the Project.

70.    On April 15, 2024, after referencing prior emails, letters, and meetings, Bilfinger notified InFab (in writing) that InFab's inadequate performance had significantly delayed and

disrupted Bilfinger's work to complete the Project and significantly increased Bilfinger's costs ("April 15, 2024 Notice").

71.    In the April 15, 2024 Notice, Bilfinger specified that the costs resulting from InFab's delays and disruptions included, but were not limited to, the following: (a) actual direct costs to address InFab's performance problems, (b) disruptions to Bilfinger's work installing pipe that required Bilfinger to work inefficiently, and (c) delays in completing work requiring Bilfinger to incur additional costs for personnel, equipment, and overhead at the Project site.

72.    Bilfinger reiterated that InFab's failure to timely perform its work in accordance with the required quality standards had, and would continue to, delay Bilfinger in completing its work and cause it to incur additional and substantial costs.

73.    Accordingly, Bilfinger informed InFab that it (a) would make no more payments to InFab until it had completed all corrective work and Bilfinger had accepted that work and (b) was back charging InFab the almost $550,000 that Bilfinger had incurred to date because of contaminated piping and shop-welding problems.

74.    On April 18, 2024, InFab responded to Bilfinger's April 15, 2024 Notice by noting that (a) it had mobilized to the Project site on January 9, 2024 to repair welds and was still on site doing so; (b) InFab's third-party NDE (Xcel) had failed to properly evaluate the RT film under the governing code and created InFab's "field weld repair situation"; (c) despite Xcel's admitted liability it refused to share financial responsibility for the additional costs that InFab had incurred to date; (d) Bilfinger had refused to pay InFab more than $1.3 million without documenting why it would not pay that amount; and (e) InFab had borne full financial responsibility for all repairs since mobilizing on January 9th and continued to incur approximately $300,000 in repair costs per week.

75.    InFab, however, failed to pay at least two of its subcontractors as Tier 1 and Riley Power Group have filed Verified Statements of Lien against the real property owned by Evonik

on which the Project is located in an effort to get paid for the work that they performed for InFab on the Project.  These amounts total almost $900,000 that, due to Bilfinger's obligations in the Master Services Agreement with Evonik, Bilfinger has paid, or may  have to pay, to have the liens removed from Evonik's property.

76.     Accordingly, InFab informed Bilfinger that it would "cease work on site and begin immediate demobilization of our crews."

77.     In other words, InFab threatened to abandon Bilfinger and the Project.

78.     On April 19, 2024, InFab abandoned Bilfinger and the Project and directed its subcontractors to stop working on the Project.

79.     On April 19, 2024, Bilfinger, in light of InFab's pending abandonment of the Project, (a) directed InFab to submit all turnover documents including, but not limited to, NDE reports for in-shop fabrication and field repairs, Positive Material Inspection ("PMI") reports, Material Test reports ("MTR"s), and other required documents and (b) warned InFab that failing to provide the required turnover documents would cause further delays and increased costs.

80.     That same day, InFab responded by stating that (a) it had turned over all NDE repair packages to its own subcontractors TC Boiler, Inc. ("TCB") and Tier 1 to maintain current workflow; (b) it understood that Bilfinger would utilize InFab's current subcontracted welding crews (TCB) on site; and (c) the missing PMIs, MTRs and other documents did not impact anything and would not create delays or cause Bilfinger to incur additional costs.

81.     Industry standards and practices required InFab to turn over all documents, including, but not limited to, NDE repair packages to Bilfinger. Likewise, contrary to InFab's assertions, the absence of PMI reports creates substantial and costly problems when turning over systems to Evonik and the fact that InFab provided critical documents to TCB and Tier 1 rather than Bilfinger simply made a bad situation worse.

82.     In other words, other than Xcel's NDE reports, InFab turned over minimal documents to Bilfinger thereby significantly hindering Bilfinger's ability to identify and remedy the problems that InFab had left behind when it abandoned Bilfinger and the Project.

83.     As such, Bilfinger subcontracted directly with TCB and Tier 1, both of which had previously worked for InFab on the Project, to continue the weld repairs and NDE work respectively, as this would allow the maximum continuity on the repairs and would help to mitigate any further delays and disruption caused by InFab's abandonment of the Project.

84.     On April 23, 2024, Bilfinger notified InFab that it had materially breached the Agreement by abandoning the Project, thereby forcing Bilfinger to take over and complete InFab's work, and demanded that InFab immediately provide documents, reports, and film pertaining to InFab's defective shop fabrication and field repairs (the "April 23, 2024 Notice").

85.     More specifically, the April 23, 2024 Notice directed InFab to provide the requested documents to Bilfinger by 5pm on April 26, 2024 and warned that failing to provide those documents would significantly delay Bilfinger's efforts to complete InFab's work and cause Bilfinger to incur substantial costs for which InFab would be responsible.

86.     On May 3, 2024, Bilfinger requested that InFab meet with it to review InFab's PMI percentages.

87.     That same day, InFab (Trent Culp) responded that it had already provided all quality documents and additional reporting and would not be able to speak with Bilfinger that day.

88.     Bilfinger responded that it was disappointed that InFab would not meet it to explain the PMI percentages considering the current NDE problems and requested that InFab provide certain information and reports required to allow Bilfinger to understand each system's requirements.

89.    Bilfinger eventually received the PMI from InFab, but it was useless because Xcel had failed to tie the PMI to the fabrication isometric drawings ("ISOs") thereby preventing Bilfinger from verifying the PMI's test points or the required system percentages.

90.    As such, Bilfinger had to engage Tier I to perform PMI testing on InFab's entire fabrication as documented in NCR-012. That testing resulted in more than 8,900 PMI tests that required test mapping.  In that testing, Bilfinger identified thirty instances where InFab had used incorrect materials. Those findings required Bilfinger to rework the affected welds/materials and inspect them before Evonik can perform a final PMI to verify that they were correct.

91.    Evonik is currently performing additional PMI inspections and has identified approximately eighty more instances where InFab had used incorrect materials.

92.    Those findings also require Bilfinger to rework the welds/material and inspect them before Evonik can perform a final PMI to verify that they were correct.

93.    Bilfinger also noted that InFab had agreed to provide the requested information and reports and to meet with Bilfinger to discuss those items, but InFab has since informed Bilfinger that it would not meet with Bilfinger.  As such, Bilfinger informed InFab that it would have to conduct a full audit and proceed in its discretion based on the audit's findings.

94.    Bilfinger requested that InFab send all NDE records and film to the Project site.

95.    InFab complied with Bilfinger's request by sending the film and the records in a single large container without categorizing them in any manner.

96.    As a result, Bilfinger had no choice but to perform a second audit centered around completeness and categorization that required a considerable effort.

97.    During that second audit, Bilfinger found numerous missing reports that required it to perform additional NDE in the field.

98.     InFab also created problems regarding fabrication certified mill test reports ("CMTRs").  A CMTR is a quality-assurance document that documents the type and source of the material that is generated by a material manufacturer that gets passed down to the end user.

99.     The CMTRs are extremely important for the Project because Evonik purchased all material and had it shipped directly to InFab.

100.     Bilfinger reviewed InFab's ISOs and found that several identified heat numbers entered on the ISO (heat numbers correspond to a number stamped on material) did not have a corresponding CMTR.

101.     Accordingly, Bilfinger asked InFab (specifically Eddie Gasbarri and Trent Culp) to meet with it remotely so that it could explain why some heat numbers had no corresponding CMTR.  Again, InFab has ignored that request. The missing CMTRs will cause additional work for Bilfinger and will negatively impact on Bilfinger's efforts to turn over the Project to Evonik.

**VI.   InFab's Production, Quality, and Documentation Problems Along with Xcel's Inadequate Inspections/Evaluations, Incorrect Determinations, Other Errors and Misrepresentations Delayed and Disrupted Bilfinger and Caused Bilfinger to Incur Substantial Additional Costs.**

102.     As detailed above, InFab's production, quality, and documentation problems along with Xcel's inadequate inspections/evaluations, incorrect determinations, other errors and misrepresentations (a) inexcusably delayed the Project's Critical Path, (b) caused Bilfinger to install piping inefficiently, and (c) required Bilfinger to incur substantial additional costs.

103.     To date, Bilfinger has incurred additional costs of at least $10 million to repair InFab's defective welds plus additional costs because InFab's production, quality, and documentation problems and Xcel's inadequate inspections/evaluations, incorrect determinations and other errors required it to install piping inefficiently, delayed Bilfinger's work, and delayed the Project.

## COUNT ONE – BREACH OF CONTRACT (INFAB)

104.    Bilfinger repeats and realleges all paragraphs above as if set forth fully herein.

105.    As identified above in detail, InFab materially breached the Agreement throughout its time on the Project before materially breaching it by abandoning the Project.

106.    In fact, InFab has acknowledged materially breaching the Agreement but blames its NDE subcontractor Xcel for some of those material breaches, which, of course, does not excuse InFab's failures or material breaches.

107.    InFab's material breaches of the Agreement caused delays, created disruptions, and damaged Bilfinger.

108.    Conversely, Bilfinger performed as required by the Agreement, satisfied all conditions precedent, and is entitled to payment from InFab.

109.    As a direct result of InFab's material breaches of the Agreement, Bilfinger's has been damaged by incurring costs of at least $10 million to repair InFab's defective welds, in addition to substantial costs resulting from InFab's production, quality, and documentation problems that required it to install piping inefficiently, delayed Bilfinger's work, and delayed the Project.

## COUNT TWO – BREACH OF WARRANTY (INFAB)

110.    Bilfinger repeats and realleges all paragraphs above as if set forth fully herein.

111.    As identified above in detail, InFab materially breached the warranties contained in the Agreement throughout its time on the Project.

112.    In fact, InFab has acknowledged materially breaching those warranties but blames its NDE subcontractor Xcel, for some of those material breaches which, of course, does not excuse InFab's failures or material breaches.

113.    InFab's material breaches of the Agreement's warranties caused delays, created disruptions, and damaged Bilfinger.

## COUNT THREE – NEGLIGENCE (INFAB)

114. Bilfinger repeats and realleges all paragraphs above as if set forth fully herein.

115. InFab owed Bilfinger a legal duty to perform its work in a good, workmanlike and non-negligent manner.

116. InFab knew and/or should have reasonably foreseen that Bilfinger would incur damages as a proximate result of InFab breaching its duty to perform its work in a good, workmanlike and non-negligent manner.

117. As identified above in detail, InFab negligently breached its legal duties to Bilfinger.

118. As a proximate result of those breaches, Bilfinger was delayed, disrupted, and damaged.

## COUNT FOUR – CONTRACTUAL DEFENSE, INDEMNITY AND HOLD HARMLESS (INFAB)

119. Bilfinger repeats and realleges all paragraphs above as if fully set forth herein.

120. In the Agreement, InFab expressly agreed to defend, indemnify, and hold harmless Bilfinger and Evonik from Claims arising out the goods provided and/or services performed by InFab and its subcontractors such as Xcel.

121. As identified above in detail, InFab has failed to defend, indemnify, and hold harmless Bilfinger and Evonik from Claims including, but not limited to, liens filed by InFab subcontractors Tier 1 and Riley Power Group.

122. InFab has breached, and continues to breach, its contractual obligations to defend, indemnify, and hold harmless Bilfinger and Evonik from Claims.

123. Bilfinger has been damaged, and will continue to be damaged, because InFab has breached, and continues to breach, its contractual obligation to defend, indemnify, and hold harmless Bilfinger and Evonik from Claims.

## COUNT FIVE – COMMON-LAW INDEMNITY (INFAB)

124.    Bilfinger repeats and realleges all paragraphs above as if fully set forth herein.

125.    Bilfinger has incurred damages solely due to InFab's active or primary negligence and is therefore entitled to full indemnification from InFab under Alabama law.

## COUNT SIX – NEGLIGENCE (XCEL)

126.    Bilfinger repeats and realleges all paragraphs above as if fully set forth herein.

127.    Xcel owed Bilfinger a legal duty to perform its work in a good, workmanlike and non-negligent manner.

128.    Xcel knew and/or should have reasonably foreseen that Bilfinger would incur damages as a proximate result of Xcel breaching its duty to perform its work in a good, workmanlike and non-negligent manner.

129.    As identified above in detail, Xcel negligently breached its legal duties to Bilfinger.

130.    As a proximate result of those breaches, Bilfinger was delayed, disrupted, and damaged.

## COUNT SEVEN – NEGLIGENT MISREPRESENTATION (XCEL)

131.    Bilfinger repeats and realleges all paragraphs above as if fully set forth herein.

132.    As identified above in detail, Xcel misrepresented material facts recklessly without knowledge or by mistake and innocently and Bilfinger acted, to its detriment, on those misrepresentations.

133.    Examples of Xcel's misrepresentations of material fact include, but are not limited to, the following:  (a) incorrectly  determining RT test results (accepting or rejecting InFab's welds) under the governing code, (b) evaluating radiographs of welds with non-compliant image quality, (c) failing to use "film side" markers or "F" letters required by applicable industry standards or placing those markers or letters incorrectly, and (d) failing to tie the PMI to the ISOs thus preventing Bilfinger from verifying the PMI's test points or required system percentages.

134.    Bilfinger  reasonably relied on those misrepresentations and has incurred damages as a result.

### COUNT EIGHT – COMMON-LAW INDEMNITY (XCEL)

135.    Bilfinger repeats and realleges all paragraphs above as if fully set forth herein.

136.    Bilfinger has incurred damages solely due to Xcel's active or primary negligence and is therefore entitled to full indemnification from Xcel under Alabama law.

### PRAYER FOR RELIEF

WHEREFORE, Bilfinger prays for Judgment against InFab and Xcel, jointly and severally, as follows:

A.    Compensatory damages in an amount to be determined at trial but not less than $10 million.

B.    Interest, costs, disbursements, and attorneys' fees in an amount essential to the doing of justice.

C.    Such other and further relief as this Court deems just and proper.

Dated:  October  17, 2024

Respectfully Submitted,


*/s/ Jarrod J. White*
D. BRENT BAKER (BAKED9981)
JARROD J. WHITE (WHITJ1010)
*Attorneys for Plaintiff*


**OF COUNSEL:**
FRAZER GREENE LLC
Post Office Box 1686
Mobile, Alabama 36633
Tel: (251) 431-6020
dbb@frazergreene.com
jjw@frazergreene.com

**KILPATRICK TOWNSEND & STOCKTON LLP**

By: /s/ Patrick E. Gaas_____
(*Pro Hac Vice Applications Pending*)
Patrick E. Gaas (Lead Counsel)
(TX Bar No. 07562790)
John Bergin (Counsel)
(TX Bar No. 24129461)
Heather Asselin (Counsel)
(Texas Bar No. 00797143)
Edward S. Hubbard (Counsel)
(TX Bar No.  10131700)
*Attorneys for Plaintiff*
700 Louisiana Street, Suite 4300
Houston, TX 77002
(281) 809-4076 | Telephone
(281) 929-0787 | Facsimile
pgaas@ktslaw.com
jbergin@ktslaw.com
hasselin@ktslaw.com
ehubbard@ktslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on October 17, 2024 served a copy on the following by first class mail, postage prepaid:

InFab, LLC
c/o O'Neal, Inc.
10 Falcon Crest Drive
Greenville, South Carolina   29607

XCEL NDT LLC
c/o Will McBride
4411 SW 34th Street
Oklahoma City, Oklahoma 73119

/s/ Jarrod J. White_____
OF COUNSEL